Case number 10-1740, Fernando Caburnay v. Norwegian American Hospital Good afternoon. Mr. Rafsek, you'll be arguing for the appellant? Yes. And Mr. Griffin, you'll be arguing for the appellee? Yes. You know, I just want to say as an aside, by way of apology for the delay today, I remember at the appellate lawyer's luncheon last year, I was sitting at a table with you, and one of the things you and other people at the table were saying was that you wanted us to set more cases for oral argument. Careful. You probably forgot to say, but not on days when you're the last one to be called. So we do apologize for that. Mr. Rafsek. Good morning, Your Honors. As I said, Michael Rafsek. I'm here on behalf of the plaintiff appellant, Dr. Caburnay. This is the unfortunate case where Dr. Caburnay called the elevator, stepped back on the carpet, fell back and caused himself a serious injury. The trial court granted summary judgment to the hospital. The hospital's primary argument down in the trial court was that we hadn't proved, the plaintiff hadn't proved the mat was defective. The trial court really granted the summary judgment because it really, on the grounds that it thought that the hospital didn't know that its mat was likely to have a fold in it. Well, let me ask a couple of questions here, if I might, Mr. Rafsek. I think the first question that at least I had in this case was whether the plaintiff's testimony in his first deposition is sufficient to create a material issue as to whether any aberration in the mat caused his injury. And one of, and concomitantly with regard to the spoilation issue, which is not entirely independent of the first issue in the case of negligence or premises liability as the case may be. Do we, what evidence is there or what is in the record that would establish an issue as to whether these mats had rubber backing? One of the witnesses testified that mats have rubber backing, but when he so testified, if you look at his testimony closely, he was referring to mats in general. Nobody knows whether this particular mat had a rubber backing because obviously they disposed of it. The second point I would have in answering that, Your Honor, is that if mats that have a rubber backing do not fold, then this mat must not have had a rubber backing because Dr. Cabernet said there was a fold in it. Well, that's reasoning in a circle, isn't it? It is, but it is what we're proving. Proving the cause through the effect, which is not ordinarily a satisfactory way of resolving these issues. It's not. So I would cut that circle in half or cut, break in it by looking at Dr. Cabernet's testimony. Dr. Cabernet did not say, as in some of the cases the defense cited, it must have been the carpet. I think I did this. He said very specifically, as I'm sure Your Honors are aware. I know you've all read the briefs. I felt my foot catch. Let's get back to that first issue for a minute. We have a number of variables involved in that particular testimony. Yes. We first have several, the lapse of a lengthy period of time in which Dr. Cabernet discussed the fall without ever mentioning the mat as being, playing a part in that fold, but mentioning rather the floor. And that raises, I suppose, a question whether that's generic enough to include the mat. And if it's simply generic, what significance is there by the fact that he didn't identify the mat? Then he identifies the mat as the place which he felt with either the sole or heel of his left shoe, I believe. Yes. Okay. So he has that. But there's a bit of a fly in that colloquy in which he makes that identification, where he makes a rather puzzling comment. That's what my lawyer said. And then we have his evidence deposition where he talks, where he acquiesces to a leading question, planting the word assumption in his testimony, that he assumed it wasn't. Correct. As to whether or not, as to what he said after the accident, I would remind the Court that he told his emergency room doctor, I tripped. Not that I slipped. I didn't say I tripped on the mat. But he said I tripped. And he was on the mat. That would suggest that if you trip and you're on the mat, you mean you tripped on the mat. As to his admission. Well, except there are some cases that pull us in the other direction, simply by looking at his position. They do, except they don't have a case, as we have at FinTech, where the witness says, I felt the defect in the mat. As to what he said at his deposition, I think I laid it out, I hope, pretty clearly in my reply brief. The exchange at the discovery deposition, with this, that's what my lawyer told me, is, I think, just readily clarified. Well, you could read it, I suppose. Not only could I read it, the lawyer for the hospital who was there read it that way. Because after they had that exchange, and the witness said, that's what my lawyer told me, the lawyer said, you have to answer the question. That was an objection, you have to answer the question. And they then re-read the question, and nobody said you already answered it. I don't mind making a softball comment to you about that, because I want to hear what your opponent might respond to that. First of all, Dr. Cabernet seemed to have retained his competence after the fall, so that he was not, in common parlance, an idiot. Not at all. And probably knew the difference between testifying from his memory or simply throwing out the fact that my lawyer told me to say that. That would support the contextual interpretation that his reference to, that's what my lawyer tells me, referred to the lawyer's objection, rather than to his substantive testimony. At any rate, that's an interpretation that seems to have viability, and for purposes of summary judgment, may be enough to preclude that conversation from being used as a summary judgment. I would suggest to the Court that as soon as the Court begins to weigh Dr. Cabernet's testimony, that proves my point, you need to take this to a jury. I didn't say, and we didn't argue, this is the best case, it's going to be a difficult case, but maybe not so difficult when we find out that the hospital is told, you should have taken this, Matt, and refused to do it. The interpretation of the comment, that's what my lawyer told me, is certainly fodder, as Justice Gordon's colloquy with you suggested, for a trier of facts should the case ever get to that stage, which is what we're really here to discuss. And so I'm going to suggest we go back to what evidence there is that would create an issue of fact as to the issue of causation, so that we can see. And I think the issue of causation, I thought, was well addressed in Fintach, because we have almost a mirror image of the Fintach case. The woman in Fintach, if you recall, walked down the aisle, slipped, said the floor felt slippery, didn't see it, her husband didn't see where she fell, and nobody saw anything where she fell, and yet the trial court there affirmed the judgment on behalf of the plaintiff. The same thing. But there they actually observed what she said she felt. Well, after she said she felt, there was presence there, which unfortunately is not the case, unfortunately from your perspective, is not the case here where the fold, if it was there, was dissipated by the time anyone observed it. Exactly. Except in that case, any water present on that floor that was identified by anybody was someplace away from where she fell. No one saw water where she fell. Here the thing that he fell on arguably is right there. But on the other hand, your argument would be, and I think there's some allusion to it in your brief, that having a tactile sensory impression can preclude, it may be sufficient so that one who is blind who can't say I saw it can still say I touched it or I felt it, as long as the word felt is interpreted not as an emotional description, a description of emotion, but a description of a sensory perception. A physical manifestation of contact, if you will. I note that the hospital does not have an answer for that in their brief. As to the question of the negligence aspect, because I don't want to overlook that, the engineers both testified these mats have to be taped on. There's no need to put the mat there in the first place. I think a jury could find negligence just on that alone. Why do you put a mat in front of a door if there's no reason for putting the mat there? You might put it in front of a doorway where it's wet or someplace else, but in front of this elevator, as soon as you put a mat there, the engineer said that's fall risk. But if you put it there, tape it down, we know it could be taped. We know that Krauss tried to tape it. The hospital kept taking it up for some reason. They said they had to clean under it. Except there are cases that will tell you that simply putting a mat down does not, in and of itself, support a claim of negligence or premises liability. That's correct. Unless there's a defect in that mat. And the defect, that's exactly right, Your Honor. That's our point. And then we get back to where we started. If this mat had a fold, it needed to be taped down because a fold in the mat is defective. Would the lack of a rubber backing be that defect? I ask you as a conduit towards your opposition. Yes. It could be. And if we had the mat, it would make our case stronger, which takes me right to this foliation question. Even if this Court sees fit to grant summary judgment, we still have to deal with the spoliation theory. The trial court knocked out our spoliation count because the trial court said, you have enough to go to a jury, although she granted summary judgment against us, you have enough to go to a jury with the mat. Except that if you want to shift right now to spoliation. I'm sorry. That's okay. Let's talk about that for a little bit. The question is, what could the production of the mat have disclosed that wasn't otherwise disclosable with the same effect? I'm adding that. The fold disappeared. There is no question about that. So they couldn't have seen it. The mat in itself was not on its face defective. There was testimony, the only eyewitness testimony, corroborating the fact that there was a rubber backing. I'm sorry. The eyewitness who talked about the rubber backing, if you read his testimony closely, that's the maintenance man, he was talking, if you read it closely, mats in general that they had, not this particular mat. I made that point in my reply. Whether there was or there wasn't rubber backing to that mat doesn't answer the question about whether there was or there was not a fold. At best, arguably, it increases the likelihood that there could be a fold. Exactly. That's precisely my point. But then I think backing up on the spoliation, going back to Boyd and Darden and the whole line of cases that follow the spoliation issue into 501 creating presumptions, for approximately three and a half months, this goes back to his initial conversation, there was no whisper about the mat being involved in this occurrence. So the question is, why would the hospital have been under a duty to preserve that mat in the absence of any claim for it, any court action involving it, or any whisper that would get to the defendants that the mat was involved? So why would the retention of the mat be a breach of the hospital's duty? Why would the hospital think it should keep the mat? Curiously enough, that's not the basis for the trial court's summary judgment on spoliation. It had a different reading on it. My answer to that is simple. It was a serious accident, obviously a very serious accident. The hospital investigated immediately. He was on the mat when he fell. I think anybody could see that. Why would you not hold the mat? Because it's not under the common law, there is no duty to preserve the evidence in the absence of the four Boyd elements. Right. In this situation, it was their mat. They had control of it. It's voluntarily controlled. It's more than voluntarily controlled. Voluntarily controlling it is also their mat. When you have a situation like this where somebody fell, my suggestion to the court is under Boyd, would a reasonable person think that that evidence might be relevant to some litigation? I would suggest to the court that it would. It wasn't some janitor who threw it away. This hospital actually did the investigation. Assume that the hospital might have believed that there is some, first of all, let me back up for a minute. Is it that the hospital threw away the mat or couldn't any longer identify the mat, which may very well have been within its possession, but it wasn't sequestered as such? What are the facts on that if they're in the record? I can't answer that with certainty. My impression, which isn't obviously valid finding on anybody, is that the mat was gone because by the time we'd asked to look for it early on, by the time we got to go look at it in the record, it was way down the road. We sued for not having a secure mat by the time our request to produce the mat was honored. We were months and months to me, years way down the road. So at that point, the turnover, if you read between the lines, the turnover on these mats is such that it was in all likelihood gone. Your Honor didn't raise one thing I wanted to point out in terms of proving our case, and it goes, it all combines together, is the 5.01, adverse inference. And we suggest the Court can use the adverse inference if the mat's gone, the hospital disposed of it, if they, if we're entitled to 5.01 for the jury, we should be entitled to it. That's an issue here, isn't it? Whether, in fact, it simply would suffice if we found that there was a breach of duty to preserve it, whether that would suffice simply to keep your second count alive, or whether that would create a presumption which would win the first count, or certainly go a long way towards helping you win the first count. And then we don't even reach the issue of balancing and weighing the evidence between the circumstances under which you've just surmised why it isn't there, as opposed to a case where somebody comes running up from the hospital wearing a janitor's uniform, pours gasoline on the thing immediately, and drops a match on it. That case I could probably argue with some confidence. Even I would be able to carry that one to this Court, Your Honor. I understand we're some degrees removed from it. But we're not so far removed from it that the removal was, that it's important was unknown. It should have been unknown to the people involved. It wasn't something peripheral. It was pretty key to the action, sort of like the tire or the wheel assembly that fell off the car. You pretty much know when something like this happens, that's why they investigate it so thoroughly. Somebody's going to come looking. Well, 501 is a stretch from the certainly willful spoilation, because 501 deals with the withholding of evidence where you have it. That's correct. And don't produce it, treat it the same way as withholding testimony, where you have the witness and don't produce them, without equal availability. So this is a bit different. This is not a situation where they have it and are withholding it. So, yeah. Anything else? Unless, Your Honor, you have further questions of me, obviously. I have only one short one, I hope. I don't mean to make this. Explain what the difference would be in your case. If we went with a negligence theory as opposed to a premises liability. If I recall correctly, under the premise of liability, then the notice issue becomes more important. We argue it's not a premises liability. It's a negligence case because it's their mat. If this was a situation where a tool had been dropped on the mat. I've seen the Donovo case used both ways. It's used as a general negligence case. It's also used as a premises liability case where the premises become defective through the act of the owner. Here we have a mat, arguably defective, put down by the hospital. We view that as simply as if somebody working for the store dropped something in the aisle. Same scenario. That's about the most common twist I could put on that, Judge. I can't do better. Thank you, Mr. Griffin.  Mr. Griffin. May it please the Court, Hugh Griffin for the defendant, Apolline, Norwegian American Hospital. I don't know which issue you want me to address first, but if you want to start with the testimony. Since I'm not going to participate in anybody's piece, I think you'd better choose your own issues. Very good. Just on a record note, I don't understand Mike's. He made that assertion in his brief that the testimony by Mr. Gonzales about the mats had a rubber backing was simply a generic description of the mats in general. Well, he says that the way this accident occurred creates, I'll add the word, strong inference that it was slidable. And if it had rubber backing, it wouldn't be slidable. I'm trying to interpret in what I consider the best light the impact of that evidence. So if that's the case, you have conflicting evidence, mainly a conflicting inference versus conflicting testimony. And in that case, then, wouldn't the availability of this mat make a difference? But I understood you were about to address what Mr. Gonzales said. Yes. That's at page 2366. And the question by plaintiff's counsel was, in terms of the materials of the mat, was it a rubber base on bottom and then fabric on top? And the answer was yes. And the plaintiff's experts all said, well, if you have a rubber base on it, that's a non-slip material. And that's the norm. But there is, are you saying there's no question mark, no reasonable question as to whether this man had a rubber backing? Absolutely. No basis in the evidence to ever make a reasonable inference to whatever degree of probability you need for circumstantial evidence that this mat didn't have a rubber base. You're arguing that quote is a declarative statement that the mat in question, which no longer could be identified, had a rubber backing. Right. And that is the case of what happened here. We went three and a half months, as your Honor pointed out, without any indication the mat was an issue at all. Again, our security people went out there after the fall, couldn't see anything. Dr. Cabernet made no contemporaneous statements. Well, that's assuming that by not specifically pointing out the mat, that simply saying that he fell on the floor does not encompass the mat as well. You had the video. And if you did an investigation, you saw where he was. Yes. Isn't it reasonable to assume that whether the mat was visible or not, everyone knew where the mats were? Or some people at the hospital whose job it was to put down the mats knew and revealed as a part of their investigation where the mats were? Where the mats were. Well, I mean, the mats are taken up and cleaned on a regular basis. I would presume that a Norwegian-American had a safety person there, as would a hospital. I don't know if the record reflects that or if we can take any kind of notice of that. But one would think that even though it's a regional hospital, they're not unsophisticated about accidents. Slip and falls as well. Slips and falls. Well, all I can say is there was not one iota of whisper, if you will, in that three and a half months that anything about the mat, there's nothing in the video that shows anything about the mat, and the mat was taken up. And the initial discovery response was that we cannot identify the mat among all the mats that we have. Is there an issue that whether or not a mat was down there at the time the doctor fell? No issue about that. All right. Well, so that goes back to my point. You have a mat there, and the fact that there wasn't a whisper in your terms of the mat being the problem, you knew where he was, which was in front of the elevator. You knew what he was standing on, which was a mat. How much of a whisper do you need? I think you need at least a sense of it. Does somebody else sustain the word mat before there's any obligation to consider preserving it? If you compare it to the case law that we're working with, you know, the exploding heater, the tire assembly that fell off, I mean, all of these are things that are directly implicated, no issue about it, in the accident. And there was no basis for us to conclude that the mat, other than it was the surface on which he fell, was in any way a cause of his fall. He never said anything about it. In your favor on that point, something that Mr. Ratzak may want to talk about in the rebuttal, is the fact that other than the backing, if that's an issue, but if it's not an issue, there's absolutely no tells, using the poker phrase, to be gained from having the mat. Because the fold disappeared. If it had the backing, then the mat told us nothing, would tell us nothing. That was Judge Mulhern's analysis, so she never even got to the duty issue. So she decided it on the basis that you just stated, that there's no showing that if the mat was here, then to a reasonable probability, you could have proved your case. As you say, the only evidence is that it wouldn't have given you anything, because it's absolutely undisputed that after the incident, nobody saw a fold there. But I don't think you get past duty. I mean, you've got two prongs. But that also highlights the significance of the question of whether there was a rubber mat in here or not. Well, again, I would respectfully submit that there's just no testimony in this record that would allow a fact finder or anyone to come to the conclusion, based on anything other than raw speculation and conjecture, that this did not have a rubber mat. I mean, again, the question I asked you was not, but the question I read to you by plaintiff's counsel was not a generic question. He says, in terms of the materials of the mat. The mat. Was it rubber base on bottom and then fabric on top? And the answer was yes. So I think I don't see how, even on summary judgment, we can hypothesize some nonexistent evidence. But, again, I think you decide the spoliation either on the proximate cause issue that we've discussed or on the fact that, you know, there's this other requirement, that there be a contract agreement, a statute, a voluntary undertaking, or some special circumstances. And it's pretty clear from the cases, they don't just mean foreseeability. Maybe the mat's involved. It may mean something else. The only case that really addressed it, I think, was the Miller case, where the plaintiff's attorney at least made a phone call and said, hey, you know, we're getting ready to file a lawsuit. Doc, can you hold on to those x-rays for us until we get ourselves sprayed down and get our records? Throw them in a soup pot. Pick them up and burn them. Well, he put them down next to the garbage. Let me just go to, if I could, to this idea that the doctor, his testimony was sufficient in itself. We discussed this with Mr. Rasset to establish that there was, in fact, a fold that caused this fall, which nobody undisputedly ever, ever saw. What was Phoenix afraid of? I'm sorry, Jeff. What was Phoenix afraid of? Phoenix settled this case. That's part of the record. That's a good question. That's a good question, because if you look, I think it kind of ties into what I was going to say, and that is that, you know, contemporaneously all he said was, I slipped on the floor. But you knew that wasn't true because he was on a mat, and you don't slip on the mat. Right. But then I think his first deposition says it all, if you will, because what he was asked in the deposition, the first one was, did you look at the video yet? And he goes, I looked at it the night before the deposition. Well, did you have any independent recollection before you looked at the video of what happened? And his exact testimony was, I walked to the elevator, I touched the button, and I fell on my back. That's all I can remember. And then he said, I watched the video, and it explained everything to me. Aren't these issues, I mean, what you're raising right now, something more useful to a jury than it is to a trier of law? If it was a basis of choosing inconsistent testimony, I would say yes. I'm suggesting that you take his whole body of work, if you will, and I think at the beginning of this first step, the question is, is what he said enough to get his feet in the ground so that he gets entitlement to a jury? And no one has really taken that on seriously in the briefs as I see it, because I don't think it lends itself to that. I think unless, you know, you can try to get someplace with my lawyer told me to do this, and then there are all kinds of interdicts about letting someone squirm out of a summary judgment by recantation that involves lying. But nobody has argued that here, and for good reason, I would think, aside from the fact that there are really good lawyers working on this case on both sides, who don't play long shots like they were short shots. But on the other hand, the fact that his testimony is tenuous, but if in fact feeling a fold is possible in this universe of discourse, and he says I felt the fold without compelling us to say you are lying, if not here, then in previous testimony, he gets a jury. Yeah, I'm not suggesting that he's lying at all. What I'm suggesting is that if you just take his testimony where he said, and don't forget, he'd already filed this complaint where he said he slipped and fell, and then he had a scattergun full of allegations, and most of them focused on the fact that there was some debris or some supplies from Phoenix there. That was kind of the focus of his complaint. I think he said the map was unclean and unsecure, but he had like a laundry list of stuff. And then he said, back to the death, and his answer is derogatory. That's all he said, slipped and fell, even though he was specifically asked, hey, did you feel anything, and so forth. Ms. Griffin, if he had said, as I tripped, I looked down, I saw my heel hit this fold and went flying backwards, would that be enough? Yes. Well, then aren't we left with the distinction between I looked down and saw it and I felt it, leaving aside the other impeachment that you may think you have? See, I don't see it as impeachment because, again. All right, but let's focus on the issue. Isn't really where we are the difference between I looked down and saw it and I felt it? If he had said it that way, yes. But the way he said it was I looked at the video, and that explained everything to me. I think he's just making a deduction process. But isn't that cross-examination? Because, you know, you can certainly argue that, and maybe very persuasively, but it's also the circumstance where if someone had this horrendous, horrific fall, which none of us in this room dispute, including you, that maybe your first concern initially will be, oh, my goodness, I'm a quadriplegic. And not to describe for purposes of future litigation the incident that caused you to, with specificity, that caused your fall. And so if you agree to me that really the difference is between I saw this fall and I felt this fall, we have really a different case. I'm going to stand on my briefs on the issue, because I need to get to, you know, the other underlying issue in this case. Okay, assume there was a fall there that nobody saw. Assume he did fall. Is the hospital liable for that fall, assuming the fall was the cause of that? Right. And, you know, Mr. Rastak and I go back a long time, and I usually understand what he's arguing. But today I'm not positively sure, because. But you usually say that you usually understand, but today you don't. But, you know, there's two recognized theories in the cases, and I think Your Honor already mentioned them in these slip-and-fall cases. One is what they call premises liability, and I'm not sure these are clean-cut distinctions, but that the defendant had actual or constructive notice of the dangerous condition that caused the fall. Well, they say premises liability stands here on the basis that the hospital is the one that introduced this hazard. Do you think that they satisfied that requirement simply by saying they put the carpet on, therefore they're going to be liable without notice? No. No. No. I mean, that's. All right. Can we have you a record for saying that so that Mr. Rastak will have to respond to it? I mean, you're beyond. I mean, if that's true, every format that we see in the City of Chicago is a basis for strict liability. What would they have to do? They'd probably have to create the fold, right? Well, that's another way. Introduce the foreign object or introduce the deficit. Right. That's another way. But not simply introducing the item. That would be your position. Well, that's one point. I mean, we've got four points. For notice not to be necessary under a premises liability under Restatement 343. Right. That's certainly. I mean, I think he admits he doesn't have that. He's not even arguing that, as I understand it. It's brief, and he's not saying. Well, what about the foreseeability of installing that item? I mean, according to their expert testimony, Lithwin and their other expert, of putting mats in there, particularly a single mat, rather than restricting the mat to the elevator that was under repair. What about that? Why wouldn't there be a claim of negligence based on foreseeability? Well, first of all, as we all know, the expert cannot create the duty. That's an issue of law. So what I believe the fundamental issue is that. Well, he doesn't create the duty, but he certainly can create the facts from which the duty is gleaned. Yes, and the facts here, I think they're undisputed, is that there had never been a report of anyone falling or tripping on the mat while attempting to use the elevator. Except for Cross, who slipped on that mat earlier. Right. So there's one prior element of notice. Okay. Well, we've got Cross saying that during my workday over here on my side, inside my barricade, when I occasionally have to move these 2,000-pound weights across the rug to test the elevator, I've had a problem. That's what we get from Cross. Not that he's saying that, hey, what I'm doing here is causing you a problem over here in front of the operating elevator. He never said that. So there's no one, and the testimony is no one ever complained or reported a fall in front of the operating elevator. No one ever observed a fall in front of the operating elevator, except including, rather, two people who took the elevator, Mr. Basile and Ms. Vega, that morning before Dr. Cabernet got there. No indication in the record that ordinary hospital usage, pedestrian walks, any other way, any normal usage had ever created a fall in front of the operating elevator. So now that you're back, all you do have is Mr. Cross, and all Cross said, as I say, is I've got this problem, I wish you'd tape it down and make my life a lot easier. But he didn't say, look, I'm causing a problem over here in front of the operating elevator. You should do something. But you also have other instances where he did tape it, and it was deliberately untaped for the unholy reason of permitting the mate to clean underneath it. Well, again, if this was a case where this accident happened while Mr. Cross was working, after Mr. Cross had said, look, what I'm doing over here is creating a fall over there in front of your operating elevator, well, I think I'd have a tough case. But we're miles and miles from that. There's not even any evidence in this record other than there isn't that you ask me why Phoenix settled. That's a good question. And there's no evidence here that any work that was being done by Phoenix had anything to do with this asserted fall. I mean, this was on a Saturday morning. Nobody doing any work. No Phoenix people there. No work day. Mr. Cross said he didn't work that Friday. Mr. Guido did work that Friday, and he said, well, I don't like rolling across the mat either. I never saw a fold during the whole time I worked there. No one ever reported a fold to me. So, I mean, we're just, again, I think if we're going to find liability on these facts without any solid evidence, the duty in the law is not to protect against the possible and the conceivable, but only to protect against the reasonable foreseeable risk of harm. And I would submit to you that on this record there is no basis other than speculation and conjecture by which you could find any reasonable foreseeability that this accident was going to happen in front of the operating elevator on a Saturday morning when no work was going on. And on that basis, just on that basis, regardless of whether Dr. Carbone's testimony was sufficient, it's a sad case, but I respectfully submit it's not a legal liability case, and the summary judgment should be affirmed. Thank you, Mr. Griffith. Thank you. Final words, Mr. Ratzak. Very briefly, it will be I understand you're not suspended for most of the morning. Well, you're probably as hungry as we are, but that's beside the point. With respect to the mass condition, one of our experts, the first one, said that the standard requires that it be a non-slip backing if it goes onto a carpet, but if you put it on a hard floor, then you have to tape it. That removes the question of whether the missing mat had a rubber or not. You still had to tape it. If we found it had a rubber mat, it still had to be taped down. We know that the hospital knew that they could be folded because one of their people said, when we store them, if they are wavy when they come out, we fix that or we tape them. So the hospital obviously from that knew these mats could, in fact, have waves or folds in them. As to whether or not the description of the mat being demat was generic, obviously the court will draw its conclusion from reading those statements, unless the court has further questions. We appreciate the court's attention. No, thank you. And I want to say it was worth waiting for you two today. It was a very, very nice argument. Thank you very much.